## Case No. 3,044.

### The COLUMBUS.

[5 Sawy. 487.][1]

District Court, D. California. May 12, 1879.

DOMESTIC MATERIAL-MEN—MARITIME LIEN.

No lien exists in favor of a domestic material-man who has supplied a vessel in her home port at the request of her master, after having been notified by the owner that she had been let to the master to be run on shares and to be manned and victualled by him, and that if supplies were furnished her, it must be exclusively on his personal credit.

[Cited in The S. M. Whipple, 14 Fed. 357; The William Cook, 12 Fed. 920; The Hattie Low, 14 Fed. 880; Stephenson v. The Francis, 21 Fed. 726; The Samuel Marshall, 49 Fed. 759.]

In admiralty.

D. T. Sullivan, for libellant.
Milton Andros, for claimant.

HOFFMAN, District Judge. The question to be determined in this case is—Does a lien exist in favor of a material-man who has supplied a vessel in her home port at the request of her master after having been notified by the owner that the vessel has been let to the master to be run on shares, and to be manned and victualled by him, and that if supplies are furnished to her it must be exclusively on his personal credit?

The supreme court has decided in the case of The Lottawanna, 21 Wall. [88 U. S.] 585, that under the general maritime law, as received in the United States, no lien exists in favor of a material-man who supplies a vessel in a port of the state in which her owner resides; but, that where the state laws create a lien for such supplies, it may be enforced in the admiralty courts of the United States. The inquiry, therefore, in the present case is, does the statute of this state create such a lien? Section 813 of the Code of Civil Procedure provides: "All steamers, boats and vessels are liable: 1. For services, etc. 2. For supplies furnished in this state for their use at the request of their respective owners, masters, agents, or consignees. * * * Demands for these several causes constitute liens upon all steamers, vessels and boats, and have priority in the orders herein enumerated over all other demands; but such liens continue in force for the period of one year."

In the case of The Young Mechanic [Case No. 18,180], Mr. Justice Curtis considered

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

very carefully the nature and effect of a similar lien created by the laws of Maine. He held that it was a maritime lien, conferring a jus in re and constituting an incumbrance on the property, and existing independently of the process used to execute it. He further held that the statute conferred on mechanics and material-men such a lien on domestic vessels as the general admiralty law had previously allowed to them on foreign vessels. Of course it was not intended by this decision to hold that the liens were identical in every respect. The state laws may prescribe the mode in which the lien they create may be acquired or perfected. They may also limit their continuance to a specified period. But, except where the state laws otherwise in terms provide, the lien is to be regarded as maritime, and to be subject, as to its origin and incidents, to the same rules by which liens on foreign vessels are governed.

It is well known that these state lien laws were passed after the decision in the case of The General Smith [4 Wheat. (17 U. S.) 438], which declared that the existence of liens in favor of material-men in the home-port of a vessel depended on the local law. The case was generally regarded, however (and, it would seem from the case of The Lottawanna [supra], justly), as deciding that by the general maritime law, as received in the United States, demands of that kind were not attended by any lien on the vessel. The statutes in question were passed to remedy this defect, and to give to domestic material-men the same protection which the maritime law afforded to foreign material-men. There is no reason to suppose that they were intended to do more, or that it was sought to withdraw the demands of domestic material-men from the operation of the general rules and principles by which maritime liens are governed. Tested by those rules and principles, I think it clear that the lien claimed in this case cannot be sustained.

The authority of the master to bind the vessel, or her owner, results from his office. At the present day he has in general ceased to be, as formerly, the gerant, or active partner of a societe en commandite, and has become the stipendiary agent or prepositus of the owner. As such he is, of course, bound to obey the instructions of the latter. But the law attaches to his office certain powers and rights within the limits of which his acts, though in violation of his instructions, will bind the vessel and her owner in favor of third persons, who deal with him in good faith, and in ignorance of his instructions, and are unable, by reasonable diligence, to ascertain that he is exceeding his powers.

The limitations on the master's authority to bind the ship for supplies and necessaries have, in some instances, been enforced with great strictness, and the principle is firmly established, "that the supplies must appear

to be reasonable, or the money advanced for the purchase of them to have been wanting, and there must have been nothing in the case to repel the ordinary presumption that the master acted under the owner's authority." 3 Kent, Comm. 212. But if it be made to appear that the credit to the ship was unnecessary, either by reason of the master having funds in his possession applicable to the expenses incurred, or credit of his own, or of his owners, upon which funds could be raised by the use of reasonable diligence; and that the material-man knew, or could, by proper inquiry, have readily informed himself of the facts, the lien will not be supported." The Grapeshot, 9 Wall. [76 U. S.] 137; The Lulu, 10 Wall. [77 U. S.] 192.

Thus, where the master's authority to raise money on the credit of the vessel was by the written instructions of the owner limited to a pledge by way of bottomry, and he attempted to hypothecate the vessel in another form, it was held, that no lien was created in favor of a material-man who knew that he was acting in violation of his instructions. The Woodland [Case No. 17,976]. In this case, Mr. Justice Benedict observes: "The master has no power to bind the owner of the vessel, or the vessel herself, beyond the authority given to him by the owner, and the extent of such authority must be limited to the express instructions of the owner, or to instructions to be implied from the law of the country to which the vessel belongs, and where the owner resides. Private instructions, unknown to the person who advances money for necessaries, cannot affect the rights of such person, when he knows that the general maritime law of the country to which the vessel belongs imports authority in the master to make the contract relied on. But, even where such law, in the absence of instructions, would import such authority, instructions which limit such authority will, if made known to the party who contracts with the master, before the contract is made, operate to prevent such party from claiming against the owner of the vessel anything which does not fall within the scope of such limited authority."

Debts due for work and materials furnished to a vessel are regarded by the maritime law with great favor, and Valin and Emerigon both agree, that workmen employed by a master carpenter or caulker, who has contracted with the owner, have a lien on the vessel for the sums due them, unless notice has been given to them in order that they may not be deceived. Emer. Contr. a la Grosse, 229. See Francis v. The Harrison [Case No. 5,038]. A portion of the elaborate brief, filed by the learned advocate of the libellant, is devoted to showing, that a charterer to whom a vessel is hired in such a way as to make him owner for the voyage, or a master who is navigating the vessel, under an agreement to victual and man her, can bind her by their contracts for supplies and materials. But this position is not disputed.

It may also be conceded, that the lien for supplies may be supported, although the furnisher knew that, by the terms of the charter, the charterer was to supply the coal for a steamer, or that the master, by his agreement, was to victual and man the vessel, let to him to be run on shares. The City of New York [Case No. 2,758]; The Monsoon [Id. 9,716]. But in both these cases the supplies were furnished to the vessel in a foreign port, and in the course of a voyage. In The City of New York [supra], Mr. Justice Nelson thus states the reason of the rule: "Upon any other rule the master or agent of a vessel, in distress in a foreign port, would oftentimes find himself unable to procure the necessaries essential to his relief. The voyage might be broken up for want of supplies, or the vessel might go to decay for want of proper repairs. I have found no case where it has been held that this knowledge on the part of the persons furnishing the supplies, or making the repairs, under the circumstances stated, affects the right to charge the vessel as security for the payment."

In the case of The Monsoon [supra], the head note, prepared, it is presumed under the direction of the judge, expressly limits the rule to cases of supplies furnished to a vessel "not in her home-port." In these cases necessity calls into activity the extraordinary powers of the master, and the owner may reasonably be presumed to have contemplated and consented in advance to their exercise, and even to the violation of his own instructions, when indispensably necessary for the safety of the vessel, or the prosecution of the voyage. But these considerations have evidently no application to a vessel in her home port, where her owner resides, and where the supplies have been furnished, not merely with full knowledge of the agreement between the owner and the master, but after express notice that if furnished it must be on the credit of the master exclusively. See The John Farron [Case No. 7,341].

The material-man, who, after such a notice, persists in furnishing supplies to the master, which are to be a charge upon the vessel, in effect aids the latter in violating his contract, disobeying his instructions and committing a virtual fraud on his owner. It would not, perhaps, be going too far to say that under these circumstances the material-man is estopped to assert that he colluded with the master to violate the rights of the owner; and that he must be conclusively presumed to have dealt with him on his personal credit exclusively.

It is urged that the statute confers the lien in absolute and unqualified terms, and that the owner cannot, by any act of his, withdraw his vessel from its operation. But this is clearly a petitio principii.

The question is, does the statute confer the lien in all cases where the supplies are fur-

nished at the request of the owner, master, or consignee, or agent of a vessel? or is not the question, whether the lien has been created to be determined by applying to it the rules and principles of the maritime law and the law on the subject of agency? Unless this latter view be accepted the consequences would be anomalous and absurd. Would it be contended, that where the owner himself attended to the supplying, repairs or equipment of the ship, the consignee could, without authority from him, bind the vessel for supplies furnished by a material-man, fully apprised of the facts? Must not the "agent" spoken of in the statute be an agent actually or apparently authorized by the owner to represent him? And yet, the statute if it creates, in absolute terms, a lien for supplies furnished at the request of the master, does the like, when they are furnished at the request of the "consignee" or "agent." Again, the statute creates the lien in general terms for "supplies," and for "services rendered on board" the vessel. It will not, I think, be disputed that the supplies must be reasonable in quantity and kind, and apparently, at least, necessary and proper for the service in which the vessel is engaged. The phrase, "services rendered on board," must be construed with a similar qualification. It would not include the services of musicians hired for the master's amusement, or those of a nurse or physician to attend his child, who might happen to be on board.

I mention these illustrations to show that the words of the statute cannot be taken in an absolute or literal sense, and that they must be read by the light of the established principles and rules which are applicable to the subject to which they refer.

For these reasons I am of opinion that the lien conferred by the statute is essentially a maritime lien, that it is subject to the same rules and to be tested by the same principles as those which apply to liens for supplies furnished to a foreign vessel, and that it was not intended to confer upon a "master, agent or consignee" an irrevocable power to hypothecate the vessel for supplies in the port where the owner resides, contrary to his instructions, and in spite of his protest, and that the material-man, who, with full notice of the circumstances, furnishes supplies to the master, must look to him personally, and not to the owner or the vessel for repayment.

It is suggested that the establishment of a fixed, certain and inflexible rule, as to the rights of material-men, would promote the interest of commerce. But those interests have not been found to require the adoption of such a rule in the case of supplies furnished in foreign ports. In those cases good faith and reasonable diligence are exacted of the material-man, while the master is strictly confined within the limits of his actual or apparent authority. I should, moreover, be inclined to fear that the practice of letting vessels to persons of inconsiderable pecuniary

responsibility to be run on shares, would fall into disuse if the owners were informed, that by no notice, agreement, or other acts of theirs, they could prevent the vessel from being mortgaged for debts for which, by the agreement between them, the master was to be exclusively responsible. A useful and meritorious class of men of energy and enterprise, but of small means, would thus be deprived of the opportunity of bettering their condition by sharing in the fruits of their own exertions, and be driven to accept a purely stipendiary employment.

With regard to the facts of this case, it is sufficient to say, that the proofs seem to me to substantially sustain the allegations of the answer.

COLUMBUS, The (SANDERSON v.). See Case No. 12,299.

COLUMBUS (UNITED STATES v.). See Case No. 14,841.

COLUMBUS, C. & I. C. RY. CO. (PITTSBURG. C. & ST. L. RY. CO. v.). See Case No. 11,197.

COLUMBUS, The CHRISTOPHER. See Cases Nos. 2,705 and 2,706.