THE AURORA.

THE CITY OF BERLIN.

(District Court, W. D. Wisconsin. March 2, 1912.)

**1.** MARITIME LIENS (§ 26*)—NATURE OF LIEN—PROOF TO ESTABLISH.

A maritime lien is a privileged one, secret in character and overriding all other liens and transfers, and in the nature of things is stricti juris, and must be affirmatively shown to exist.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 39; Dec. Dig. § 26.*]

**2.** MARITIME LIENS (§ 29*)—SUBJECT-MATTER—SERVICES RENDERED ON REQUEST OF TOWING COMPANY.

A libelant held not entitled to a maritime lien on a barge for services rendered to her, while stranded, by tugs and lighters which libelant sent to her assistance at the request of the manager of a towing company, which had contracted with the owner of the barge to furnish all tugs and wrecking service required by his vessels during the season; it appearing that libelant did not even know by whom the barge was owned when the services were rendered, but in fact performed such services for the towing company.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 48; Dec. Dig. § 29.*]

In Admiralty. Suit by the Barnett & Record Company against the barge Aurora; Henry Wineman, Jr., owner. Decree for respondent.

Spencer & Marshall, for libelant.

Holding, Masten, Duncan & Leckie, for The Aurora and claimant.

SANBORN, District Judge. Final hearing on libel in rem against the barge Aurora for quantum meruit for the services of two tugs

and two lighters rendering service to the barge June 29, 1910, while stranded near Split Rock, in the vicinity of Two Harbors, on the north shore of Lake Superior. The barge was in tow of the steamer City of Berlin, carrying coal, and during a thick fog both vessels went ashore. The circumstances under which the services of the boats were rendered were as follows:

The owner, Mr. Henry Wineman, Jr., a resident of Detroit, Mich., shortly before the accident in question, entered into a contract with the Great Lakes Towing Company, which provided that the company should furnish all the tugs and wrecking service required by the boats under Wineman's management during the season of 1910 at certain discounts from the regular rates made by the towing company, and subject to the following condition:

"In case, however, at any time, for any reason, we are unable to have tugs on hand to serve your boats, you are at liberty to engage any other tugs to serve for that time, but without right to charge us any difference in price."

Soon after the accident the mate went to Two Harbors and called up Mr. Wineman in Detroit, who told him to communicate with Mr. Tomlinson, the vessel agent at Duluth. They then informed Tomlinson of the situation, and he in turn called up Capt. Vroman, manager of the towing company, whose duty it was under the contract with Wineman to render any wrecking service necessary, if the company had on hand the tugs. Capt. Vroman had no lighters, but sent a tug and a pump. The next day Tomlinson again called up Capt. Vroman and asked for a lighter and a boiler. Being required by the contract to furnish tugs, lighters, and wrecking outfit, and having no lighter or boiler on hand, Capt. Vroman communicated with libelant, through its manager, Mr. John E. Meyer, and asked him to send tugs and scows to assist the steamer and barge, and to instruct their captains to look to the masters of those boats for further instructions, whereupon the tug Meyer and scow or lighter Ajax were dispatched to the scene by libelant. After some four days work they were sent back to Superior. About the same time Tomlinson requested more assistance of Capt. Vroman, who procured libelant to send another tug and barge. For the services of these vessels the libelant claims a maritime lien, and libeled the barge accordingly.

[1] The important question is whether libelant's claim is properly one against the vessel, or only against the towing company. Was the contract between libelant and towing company made on the credit of the vessel, or in reliance only on Capt. Vroman, and as an accommodation to him? A maritime lien is a privileged one, secret in character, overriding all other liens or transfers, possibly operating to the prejudice of creditors or purchasers without notice. In the nature of things it is stricti juris, and must be shown to exist. Vandewater v. Yankee Blade, 19 How. 82, 15 L. Ed. 554; Seaman, J., in The Westover (D. C.) 76 Fed. 383. Libelant performed valuable services, and should be paid for them; but by whom? Should the vessel pay, or Capt. Vroman's company?

[2] Mr. Meyer, manager of libelant, was questioned as to whom the credit was to be extended; but he does not give a direct answer. He says he rendered the bills to Capt. Vroman, in the name of the barge Aurora and owners, and, not knowing whom to send them to, therefore sent them to him. He did not even know the name of the owner of the barge, nor that Tomlinson was his agent.

"Q. To whom did you look for your pay? A. To the barge Aurora and owners."

In January, 1911, Meyers wrote to Wineman, confirming the testimony referred to as to his talks with Capt. Vroman, and stating that it was impossible for him to say whether the equipment was ordered through the captain of the barge or Tomlinson, but that he understood from his captains that they worked under the directions of the masters of the City of Berlin and Aurora.

The owner of the barge knew nothing of the hiring of libelant until after the services were performed. Had the contract been made between his agent, Tomlinson, and libelant, a maritime lien might be presumed; the owner being a nonresident of the state where the contract was made. There was no apparent necessity to trust the vessel, and the testimony tends to show that this was not done, or even thought of. The contract was undoubtedly maritime in its nature, having reference to services performed for a stranded vessel on navigable waters. This, however, is quite a different thing from the creation of a maritime lien.

Counsel for libelant refer to Pacific Mail S. S. Co. v. Commercial Co., 173 Fed. 28, 97 C. C. A. 346, Wilmington Transp. Co. v. The Old Kensington (D. C.) 39 Fed. 496, Pacific Mail S. S. Co. v. Sugar Co., 181 Fed. 927, 104 C. C. A. 365, and several other cases. In all of these, except the last, the contract was made with the master, from which the maritime lien was presumed. In the last case cited the suit was in personam.

If there were any lawful or proper way to reach the merits of the case by amendment, that should be allowed; but the difficulty is that the owner is not in court, and cannot be bound by any amendment. He ought to pay for whatever benefit he received from the services rendered, but is entitled to his day in court on that question, which cannot possibly be given him in this case.

It is not an agreeable duty to be obliged to dismiss on a technical ground like this; but I am convinced that the maritime law gives no lien, and that the libel must therefore be dismissed.